IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| TOBY JOE BARLEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 7:16-cv-00280 |
| v. ) | |
| ) | By: Elizabeth K. Dillon |
| NEW RIVER VALLEY REGIONAL ) | United States District Judge |
| JAIL – MEDICAL DEPT., *et al.*, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION**

Toby Joe Barley, a Virginia inmate proceeding *pro se*, filed this civil rights action under 42 U.S.C. § 1983 while he was incarcerated, serving a prison term. In his verified complaint as amended, Barley alleges that two jail nurses, Jennifer Lowe and Haley Neel, were deliberately indifferent to his pain while he was undergoing a skin treatment intended to kill mites. After review of the record, the court concludes that the defendants' motion for summary judgment must be denied.

I. BACKGROUND

In denying these defendants' motion to dismiss, the court summarized Barley's allegations about his condition and course of treatment:

> Barley alleges that after arriving at the New River Valley Regional Jail, he developed a "bad rash" that caused him pain, got infected, and was so "raw from itching" that he had trouble sleeping. Barley states that he saw the doctor "numerous times" and "medical tried to the treat the rash, but was uns[uccess]ful." Medical staff attributed the rash to everything from "soap, water, deodorant, [his] nerves, [a] yeast infection, to mites." Barley alleges that although his request to go to the hospital or a dermatologist was refused, he did receive "pills and creams of all type[s]," antibiotics, and steroids to treat the rash. Barley states that he sent "numerous request[s] and letters" about the rash to defendants McPeak and Akers, but they "would not lis[ten] or bel[ie]ve" him when he told them that he was allergic to the dye in the prison uniforms or the detergent used to wash them.

> Barley alleges that from 6:00 p.m. on May 10, 2015, to 6:00 a.m. on May 11, 2015, he was seen by defendants Lowe and Neel concerning his rash. Barley states that Lowe thought that Barley might have mites and recommended "mite killer treatment." Lowe told Barley that "it was worth a try" and would not hurt him or make the rash any worse. Lowe called the doctor by telephone before administering the treatment, and the doctor approved it. Barley was told that he would stay in the medical department for the night and could not wash the mite killer treatment off for six or eight hours. Barley alleges that within seconds of rubbing the treatment on his body, he started feeling a "burning." Barley states that his skin turned red and he started "begging" for help. While Barley was beating on the door, Lowe came to see him. He told her that the mite killer treatment was burning him and asked to wash it off. She told him that "it may be part of the healing process," and denied his request. Lowe left and the pain became so severe that Barley began crying and throwing up. Barley tried to wash the mite killer treatment off with water in his cell sink, but was unsuccessful. Barley continued to beat on the door and Neel came to see him. He asked her to take him to the hospital or let him wash the mite killer treatment off. She denied both requests and told him that only Akers could approve him going to the hospital, but she "wasn't in." Barley states that he had never been in so much pain before and that the treatment burned him. At some point during the night, a sergeant and an officer came to Barley's cell after making rounds. When Barley showed them what was happening to his body, they agreed to get a camera and took pictures of him. When Akers arrived in the morning, she came to Barley's cell, told him to get dressed, and sent him to a dermatologist. Barley alleges that Akers stated that "they should have washed it off." The dermatologist confirmed that Barley was allergic to the dye in the prison uniforms and the detergent used to wash them. Thereafter, Barley was given dye-free uniforms and his uniforms [were] washed in a different detergent.

*Barley v. New River Valley Reg'l Jail Med. Dep't*, No. 7:16CV00280, 2017 WL 888367, at *1 (W.D. Va. Mar. 6, 2017).[1] The court found that these allegations stated a plausible Eighth Amendment claim that "Nurses Lowe and Neel were deliberately indifferent to [Barley's] pain and suffering while the 'mite killer treatment' was on his body."[2] *Id.* at *5.

---

[1] In this prior opinion, the court granted a motion to dismiss by two other defendants.

[2] The court notes that this claim can go forward against Lowe and Neel only in their individual capacities, since monetary damages are not available under § 1983 against officials in their official capacities. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989).

In support of their motion for summary judgment, Lowe and Neel offer their version of events.[3] On May 10, 2015, Barley came to the medical department complaining about his rash, which had not improved after previous treatment attempts. Nurse Isom examined him. She noted that the rash was red, raised, and scattered on his chest, neck, legs, arms, and abdomen, and that Barley was complaining of severe itching. At 12:50 p.m., Isom reported this information to the jail's physician, Dr. Moses. The doctor approved treating Barley's rash with Permethrin 5% cream, a topical treatment for mites, to be applied after Barley received a uniform change. At 3:00 p.m. that same day, Nurse Roseberry gave Barley the Permethrin. After he showered, he applied Permethrin to his body and told Roseberry that he felt better. She does not recall, and the progress notes do not indicate, that Barley made any further complaints about the rash, or that its appearance changed, during the day shift. According to Roseberry, Barley had access to a sink, soap, and towel in his cell in the medical department and could have washed off the Permethrin at any time.

Lowe and Neel worked the night shift, from at 6:00 p.m. on May 10, 2015, until 6:00 a.m. the next morning. Lowe does not recall all the duties she performed that night, but her routine duties often took her away from the medical department for long periods of her shift. Lowe does not remember providing any direct care to Barley during her shift, and the progress notes do not indicate that she did. She denies having any discussions with Barley suggesting that he might have mites or suggesting that he receive Permethrin cream.

Neel examined Barley at the beginning of her shift, after he complained of burning. Neel had seen Barley's rash during examinations in previous weeks. It did not look different to her that night. She had never before cared for an inmate being treated with Permethrin. Close to

---

[3] The factual summary of the defendants' evidence on summary judgment comes from affidavits by Betty Akers, RN; Jennifer Lowe, LPN; Haley Neel, LPN; Teresa Roseberry, LPN; and copies of records from the jail's medical department, which include nursing "Progress Notes" and the shift log for May 2015.

midnight, Neel noted Barley's complaint that the Permethrin was still burning and was now making him sick and causing him to vomit. Neel did not see any indication that Barley had been vomiting, and a correctional officer said he had not seen Barley vomiting. Neel took Barley's vital signs and checked his breathing, all of which were normal. The rash appeared the same as it had at the start of her shift. She noted that Barley did not appear to be in any distress. Neel noted at 4:03 a.m. that Barley had been standing at his cell door "throughout the entire shift"—"aggravated" and asking to be sent to a hospital. Akers Aff. Exh. A-1, Dkt. No. 42. At some point after that note, Barley was allowed to take a shower to wash off the Permethrin, although Neel does not remember what time this occurred, and no documentation of the shower appears in the medical records.

At 9:50 a.m., after the day shift had started, Nurse Isom noted that she had contacted Dr. Moses about Barley's "worsening rash," which "has not spread but appears more red." *Id.* Isom also reported: "Per Dr. Moses, [inmate] to be sent to Dermatology consult ASAP." *Id.* Barley was examined by a dermatologist at the local hospital emergency room that same afternoon. This specialist diagnosed dermatitis caused by allergic reactions to the dye in the jail uniforms and the detergent used to wash them, and prescribed four medications.

In Barley's affidavit in response to the defendants' evidence, he explains that the mite treatment had two steps and that only the second application caused burning. He reiterates that he made Lowe aware of the burning, and she told him it might be part of the treatment's "healing process." Barley Aff. 3, Dkt. No. 46-1. He states that all night, he was beating and banging on his door, pleading to be allowed to wash off the mite treatment, telling the nurses that his skin "was burning just getting red[d]er and red[d]er." *Id.* at 2. According to Barley, the nurses—with their chairs only thirty feet from his door—must have heard his crying and continued pleas for help. He denies having soap or a towel in his cell. He claims that since May 11, 2015, he has

4

had bad dreams of that night and "wakes himself up screaming." *Id.* at 7. He has sought mental health treatment and has been prescribed medication to help him sleep.

## II. DISCUSSION

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A movant is entitled to summary judgment only if the record as a whole *could not* lead a rational trier of fact to find in favor of the non-movant. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).[4] On the other hand, where the ultimate factual conclusions to be drawn are in dispute, summary judgment is not appropriate. *Overstreet v. Ky. Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991). A court may not resolve disputed facts, weigh the evidence, or make determinations of credibility at the summary judgment stage. *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995)

In considering a motion for summary judgment under Rule 56, a court must draw all reasonable inferences in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court "scrutinizes" each party's case "to determine whether the [party] has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993). A nonmovant, to defeat a motion for summary judgment supported by affidavits, "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. A verified complaint by a *pro se* prisoner is to be considered as an affidavit when the allegations contained therein are based on personal knowledge. *Williams*, 952 F.2d at 823.

---

[4] The court has omitted internal quotation marks, alterations, or citations here and throughout this opinion, unless otherwise noted.

Section 1983 permits an aggrieved party to file a civil action against a person for actions taken under color of state law that violated his constitutional rights. *See Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). "A prisoner has a constitutional right to the medical care necessary to address his serious medical needs." *Formica v. Aylor*, No. 16-7418, 2018 WL 3120790, at *7 (4th Cir. June 25, 2018) (unpublished) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976)). Specifically, a prison official's "deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." *See Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).

A "serious medical need," objectively, is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). "A medical condition need not be life threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010); *accord Scott v. Clarke*, 64 F. Supp. 3d 813, 822 (W.D. Va. 2014).

The defendants assert that Barley's rash, which turned out to be dermatitis, was not a serious medical need. He presents not only his rash, however, but also burning pain so severe that it made him cry and vomit. The defendants ask: if the pain was so severe, why did Barley not simply wash off the mite treatment himself in his cell? Barley denies that he had soap and a towel in that cell, and he states that water alone did not remove the treatment cream or stop the burning. The court thus finds that genuine issues of material fact preclude summary judgment on the defendants' argument that Barley's condition did not constitute a serious medical need on May 10 and 11, 2015.

Of course, Barley must also prove that, subjectively, the defendants acted with deliberate indifference to his pain. A prison official is "deliberately indifferent" only if she "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). An official can display this state of mind by ignoring an inmate's serious condition or delaying medically necessary treatment. *Estelle*, 429 U.S. at 105-106.

The subjective, deliberate indifference component of Barley's Eighth Amendment claim requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). In essence, the treatment rendered "must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990).

> The inquiry is a factual one "subject to demonstration in the usual ways, including inference from circumstantial evidence." *See Farmer*, 511 U.S. at 842, 114 S. Ct. 1970. A factfinder is entitled, in appropriate circumstances, to "conclude that a prison official knew of a substantial risk [of serious harm] from the very fact that the risk was obvious." *Id.* Indeed, jail officials "may not simply bury their heads in the sand and thereby skirt liability" by, for example, refusing to "verify underlying facts that [they] strongly suspected to be true, or . . . declin[ing] to confirm inferences of risk that [they] strongly suspected to exist." *See Makdessi v. Fields*, 789 F.3d 126, 133-34 (4th Cir. 2015) (internal quotation marks omitted). As the Supreme Court has recognized, when a medical professional of a jail facility knows of a serious medical need, the Eighth Amendment requires reasonable action. *See Farmer*, 511 U.S. at 844.

*Formica*, 2018 WL 3120790 at *9. Thus, the defendants may avoid liability "if they responded reasonably to the risk, even if the harm ultimately was not averted." *See Farmer*, 511 U.S. at 844.

Lowe argues that Barley's claims against her are based on mistakes of memory. Barley alleges that Lowe suggested the treatment for mites, called the doctor for approval, and administered the Permethrin to him. The medical records indicate that other nurses called about

7

the mite treatment and gave it to Barley during the day shift. These records also indicate that during the night shift, Neel monitored Barley's condition, and that Lowe did not make note of any personal interactions with him. On this evidence, Lowe claims that Barley relies on mere speculation about Lowe's role in his care that night and her knowledge of his condition.

Barley contends that the disputes over who called the doctor for approval of the treatment and who gave it to Barley are immaterial to his claim against Lowe, and the court agrees. Barley states that *after* the application of the Permethrin, he told Lowe of the burning sensation he felt and begged her to let him wash it off, but she denied this request. According to Barley, she also told him that burning might be a healing effect of the treatment, but she did not take any action to alleviate the risk Barley would continue to suffer severe pain from the treatment. Barley's sworn statements about these events are sufficient to create material disputes of fact about Lowe's subjective knowledge of his pain and of the risk that it would continue absent her assistance.

The defendants also argue that, as nurses, they were not qualified to diagnose the rash as dermatitis, they could rely on the course of treatment Dr. Moses had prescribed, and at least Neel was unfamiliar with its side effects. Moreover, they point to the fact that Barley was allowed to shower and remove the treatment. They contend that if they should have acted differently during the first few hours when Barley complained that the treatment caused him pain, that omission was merely negligence. *See Estelle*, 429 U.S. at 105-06 ("[A]n inadvertent failure to provide adequate medical care" is not deliberate indifference; thus, mere negligence in diagnosis or treatment does not state constitutional claim). They also point to Neel's assessments of normal vital signs and breathing, and her comparison of the rash's appearance to earlier examinations, as support for her medical assessment that Barley was not in distress and had no medical need for different treatment that night. On these factors, both nurses argue that Barley cannot show their actions that night constituted deliberate indifference.

While the defendants may be able to prove at trial that they reasonably believed Barley had no serious medical need for different treatment, or that their responses to whatever risk his condition posed were reasonable, the court concludes that Barley's evidence to the contrary is sufficient to survive summary judgment. Taking the evidence as a whole in the light most favorable to Barley, a reasonable fact finder could determine that Lowe and Neel each knew of and disregarded "an excessive risk to inmate health or safety," posed by leaving the treatment on Barley's skin for any length of time and did not take reasonable action in response by allowing the shower or calling a doctor.[5] *Farmer*, 511 U.S. at 837. That fact finder could also determine that as a result of these defendants' unreasonable delays in responding to his pleas for a shower or a doctor, Barley suffered severe and unnecessary pain for hours, followed by mental distress for months thereafter. *See, e.g., Formica*, 2018 WL 3120790 at *10 ("the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment") (quoting *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain.")).

For the reasons stated, the court concludes that the defendants' motion for summary judgment must be denied as to Barley's claim for monetary damages against them in their individual capacities for their alleged deliberate indifference to his serious medical need on May 10-11, 2015. An appropriate order will be entered.

Entered: September 26, 2018.

/s/ *Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge

---

[5] The court's conclusion that genuine issues of material fact remain in dispute also precludes summary judgment on the ground of qualified immunity. *Buonocore v. Harris*, 65 F.3d 347, 359 (4th Cir. 1995) (finding that if resolution of the qualified immunity question and the case itself both depend upon determination of what actually happened, summary judgment on grounds of qualified immunity is not proper).